W. Willard WIRTZ, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

F. M. SLOAN, INC., a corporation,
Defendant.

Civ. No. 66–1464.

United States District Court
W. D. Pennsylvania.

March 4, 1968.

On Motion to Amend Judgment May 17, 1968.

Daniel Teehan, Atty., U. S. Dept. of Labor, Washington, D. C., and Thomas Daley, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Robert D. Randolph and Robert H. Shoop, Jr., of Houston, Cooper, Speer & German, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

MARSH, District Judge.

The plaintiff, Secretary of Labor, seeks to enjoin the defendant, F. M. Sloan, Inc., from violating the minimum wage, the overtime, and the record keeping provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S. C.A. § 201 et seq. The plaintiff also seeks to restrain the defendant from the further withholding of payment of minimum wage and overtime compensation allegedly due from the defendant to five employees of the defendant in the total amount of $2,314.42 as a result of the alleged violations of the Act. This court has jurisdiction of the parties and the subject matter pursuant to 29 U.S.C.A. § 217.

The defendant is a Pennsylvania corporation having its principal office and place of business in Murrysville, Westmoreland County, Pennsylvania. During the period from December 13, 1964 to April 17, 1966, it was engaged in the production of natural gas produced by twenty-six wells owned or leased by it. During this period all the natural gas produced from defendant's gas wells was sold and delivered to The Peoples Natural Gas Company, a Pennsylvania corporation.[1] The gas was sold and delivered by defendant to Peoples on a continuous, daily basis from the defendant's pipeline into a People's pipeline. The defendant's gas wells formerly belonged to Peoples; the defendant is required by agreement to sell its entire output to Peoples.

The gas purchased by Peoples from the defendant coalesces with much larger amounts produced from wells belonging to Peoples and other producers and is transported in Peoples' pipeline.

A large percentage of the gas in Peoples' pipeline is distributed daily to the mills of Braeburn Alloy Steel Company at Braeburn, Pennsylvania, and Allegheny-Ludlum Steel Corporation at Brackenridge, Pennsylvania, which produce steel products. Approximately 95% of the gas delivered to those mills is utilized in producing steel products. Approximately 85% to 90% of the steel products of these two mills is shipped out of Pennsylvania on a daily basis.

---

1. See defendant's Request for Findings of Fact No. 4.

Although it is impossible to trace any particular cubic foot of gas produced from defendant's wells into the steel mills, I find that the defendant had reasonable ground to have contemplated and expected that a substantial portion of its gas, like that produced by Peoples and by other producers, which flowed through the Peoples' pipeline, would most probably enter the pipelines of the steel mills. I do not believe it is essential to coverage that any particular cubic foot of defendant's gas should be so traced.[2]

The defendant employed Robert Schweinsburg between the period commencing on April 19, 1964 and ending on January 31, 1966, at the rate of $1.00 per hour for a total of 2,449 straight-time hours and 181½ overtime hours (in excess of 40 hours in a workweek) for which the employee is entitled to $634.94 in back wages for violations of §§ 6 and 7 of the Act (Pretrial Stipulation, III-G, H, I and K; plaintiff's Exhibits 6 and 7).

Throughout the period of his employment, Robert Schweinsburg worked at the defendant's pumping station checking gauges and motors of the gas pumping equipment each hour on the hour and recorded the various readings of the ten or so pieces of machinery immediately subsequent to each reading, and also added oil to certain machinery.

Schweinsburg worked approximately five to ten minutes each hour in performing the aforesaid work. For the remainder of the hour he did work in his employer's pine tree nurseries, in a hot house tending bulbs and plants; he dug up pine trees, loaded cord wood on trucks, and did other odd jobs.

Defendant employed Harry C. Shaffer between the period commencing on September 12, 1964 and ending on April 17, 1966, at the rate of $1.00 per hour for a total of 3,173 straight-time hours and 342½ overtime hours (in excess of 40 hours in a workweek), for which the em-

ployee is entitled to $836.06 in back wages for violations of §§ 6 and 7 of the Act (Pretrial Stipulation, III-G, H, I and K; plaintiff's Exhibits 5 and 8).

Throughout the period of his employment, Harry C. Shaffer read and checked the gauges on the production machinery on an hourly basis and recorded the readings on company records. He also added oil to certain machinery, checked valves, and kept the office clean.

Defendant employed Andrew Osloskey between the period commencing on April 19, 1964 and ending on April 17, 1966, at the rate of $1.00 per hour for a total of 666 straight-time hours, for which the employee is entitled to $166.50 in back wages for violations of § 6 of the Act (Pretrial Stipulation, III-G, H, I and K; plaintiff's Exhibits 3 and 4).

Throughout the period of his employment, Andrew Osloskey read and checked the gauges on the production machinery on an hourly basis and recorded the readings on company records and also added oil to certain machinery.

Defendant employed William J. Creighton between the period commencing on March 13, 1966 and ending on April 17, 1966, at the rate of $1.00 per hour for a total of 146 straight-time hours, for which the employee is entitled to $36.50 in back wages for violations of § 6 of the Act (Pretrial Stipulation, III-G, H, I and K; plaintiff's Exhibits 1 and 2).

Throughout the period of his employment, William J. Creighton read and checked the gauges on the production machinery on an hourly basis and recorded the readings on company records. He also added oil to certain machinery. In the summer he cut grass and trees on his employer's premises.

Defendant employed Hugh Torrance between the period commencing on April 19, 1964 and ending on April 17, 1966 (Pretrial Stipulation, III-G, H) at the rate of $425 per month (Pretrial Stipu-

---

2. Cf. Schulte Co. v. Gangi, 328 U.S. 108, 121, 66 S.Ct. 925, 90 L.Ed. 1114 (1946); Mitchell v. Jaffe, 261 F.2d 883, 887 (5th Cir. 1958).

lation, III-J) at an average of 49 hours per week for 71 workweeks (plaintiff's Exhibit A), for which the employee would have been entitled to $640.42 in back wages for violations of § 6 of the Act (plaintiff's Exhibit 9). Hugh Torrance is now deceased, having died on August 22, 1966.

Throughout the period of his employment, Hugh Torrance was the foreman or supervisor of the other employees mentioned above.

The defendant did not record the hours worked each workday and each workweek by employee Hugh Torrance (plaintiff's Exhibit A).

■ The defendant assumes that Shaffer, Osloskey and Creighton, like Schweinsburg, worked in gas production only five or ten minutes each hour and such is de minimis (Tr., p. 19). Even if this assumption be correct, in my opinion the de minimis doctrine does not apply to regular and recurring work, and such need not be substantial timewise.[3]

I find that the duties of the aforementioned employees were performed on a regular and recurring basis and were important and necessary for the production of gas from defendant's gas wells. I conclude that these employees were engaged in activities closely related and directly essential to the production of steel products shipped in interstate commerce on a continuous, daily basis. 29 U.S.C.A. § 203(j).[4]

The defendant relies on Kaferle v. Frederick, 360 F.2d 536 (3d Cir. 1966) contending that the factual situation therein "is directly analogous to the present factual situation". I am not so persuaded. The factual differences are substantial. I think there was an immediate tie between the considerable production of steel for commerce in the mills of Allegheny-Ludlum Steel Company and the Braeburn Alloy Steel Company and the activities of defendant's employees in producing the gas upon which, merged with other gas, the steel plants depended. Cf. 29 CFR 776.19. In *Kaferle* the sales of coal made by the broker to the steel companies engaged in commerce were "isolated" and "insubstantial", whereas, here, all defendant's gas was sold daily to Peoples, and Peoples transmitted large quantities of gas daily to the steel companies.

It seems to me that *Kaferle,* apropos sales to an intermediary, is not a decision promulgated as a general proposition of isolated local activity.[5] When the entire output of defendant's gas wells is delivered daily into Peoples' pipeline, the sales are "substantial" and not "isolated"; and when Peoples' pipeline is directly connected with the pipelines in the steel mills, I think the requirements that the work of defendant's employees be closely related and directly essential to the process of interstate production of steel have been met.

After all, without gas the steel companies could not produce steel products for interstate commerce. Thus, the defendant's employees are engaged in a process or occupation which is a directly essential part of an integrated system for the production of steel products. The character of these employees' activities bring them within the restricted scope of the Act as amended in 1949. And to the extent that its employees are closely related and directly essential to the pro-

---

3. Wirtz v. Durham Sandwich Company, 367 F.2d 810 (4th Cir. 1966).

4. Mitchell v. Independent Ice & Cold Storage Company, 294 F.2d 186, 189–190 (5th Cir. 1961); Mitchell v. Moberly Fuel Co., 30 Labor Cases, ¶ 69,933. See: U. S. Code Congressional Service, vol. 2, 81st Congress First Session, p. 2253.

5. As stated in Kirschbaum Co. v. Walling, 316 U.S. 517, 520, 62 S.Ct. 1116, 1118, 86 L.Ed. 1638 (1942):
"Perhaps in no domain of public law are general propositions less helpful and indeed more mischievous than where boundaries must be drawn, under a federal enactment, between what it has taken over for administration by the central Government and what it has left to the States."

duction of steel for commerce, the employer is itself so engaged. The work of supplying gas to steel mills is so directly, closely and vitally related to the functioning of those mills engaged in interstate commerce, as to be in practical effect a part of commerce rather than an isolated local activity. Moreover, "within the tests of coverage fashioned by Congress, the Act has been construed liberally to apply to the furthest reaches consistent with congressional direction." Mitchell v. Lublin, McGaughy & Asso., 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243 (1959).

■ Under the facts disclosed, in my opinion it is immaterial that defendant sold its gas to Peoples instead of directly to the steel mills. For as stated in Schulte Co. v. Gangi, 328 U.S. 108, 121, 66 S.Ct. 925, 931, 90 L.Ed. 1114 (1946):

"Mere separation of the economic processes of production for commerce between different industrial units, even without any degree of common ownership, does not destroy the continuity of production for commerce. Producers may be held to know the usual routes for distribution of their products."

See also, Wirtz v. Intravaia, 375 F.2d 62 (9th Cir. 1967). Cf. Mitchell v. Jaffe, 261 F.2d 883 (5th Cir. 1958), wherein defendant sold scrap steel to local distributor who sold the scrap to local steel mills engaged in interstate commerce. It was held that defendant's employees were covered by the Act.

■ Since the defendant violated the minimum wage provisions of the Act by failing to pay to four of its employees the minimum rate required, and by failing to pay three of its employees time and one-half their regular hourly rate of pay for hours worked in excess of forty in a workweek, the plaintiff is entitled to an injunction restraining the defendant from the further withholding of the total amount of $2,314.42 due to the five employees for minimum wage

and overtime compensation. The plaintiff is also entitled to interest on the accrued wages owed to employees at the rate of 6% from the median point of each employee's employment.

This opinion shall be deemed to embody findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P., 28 U.S.C.A.

An appropriate order will be entered.

On Motion to Amend Judgment

Pursuant to Rules 52(b) and 59(e), Fed.R.Civ.P., the defendant moved that the findings of the court be supplemented and amended, and that the judgment heretofore entered be amended. No request was made to take additional testimony. Oral argument was held and the briefs of the parties in support of and in opposition to the motion were submitted. The proposed amendments are treated in accordance with the numbers given them in the motion.

(1) In compliance with the defendant's proposal, the last sentence of the second paragraph of the opinion is amended to read as follows:

"The twenty-six gas wells owned by defendant were acquired from F. M. Sloan on January 1, 1960. Six of these wells had been acquired by F. M. Sloan from Peoples on June 11, 1935, subject to a requirement that F. M. Sloan sell all gas produced from such wells to Peoples." [1]

(2) "An interruption of defendant's supply of gas to Peoples would not affect Peoples' ability to supply the needs of its customers."

This fact was proved and is added to the findings of fact.

■ The defendant argues that this added finding shows that its employees were not engaged in activities directly essential to the production of steel products shipped in interstate commerce on a continuous, daily basis as found. I think that this argument is fallacious. The gas supplied to the steel mills is

---

1. The amendment is stated as appears in defendant's brief, p. 2, as it requested at oral argument.

gathered by Peoples from other stations, other wells, other transmission lines; it is produced by other persons or companies; some of it is produced by Peoples itself (Trial Tr., pp. 55, 59). The number of Peoples' suppliers and the amounts of gas they respectively supply does not appear in the evidence. However, the portion of gas supplied daily by defendant and transmitted in Peoples' pipeline is assuredly an integral portion, something essentially belonging to the larger whole.[2] Since the whole amount of gas supplied by Peoples' integrated system is directly essential to the production of steel for commerce, the portion supplied by defendant partakes of the character of the whole to which it belongs, and is likewise directly essential.

> (3) "Throughout the period of his employment, Harry C. Shaffer performed the same work as Robert Schweinsburg, but at different times of the day."

This proposed amendment is rejected as an addition to the tenth paragraph of the opinion. The witness Shaffer specifically stated what his duties were with respect to the production of gas. In this respect he performed the same work as Schweinsburg but at different times of the day. He was not asked to specify what he did during the remainder of each hour. Since it is obvious that at trial the defendant thought such additional activities were unimportant, it would be inappropriate for the court to speculate on the details of these activities which as an untimely afterthought defendant now believes to be important.

> (4) "No evidence was presented to support the plaintiff's allegation

that the duties of Hugh Torrance were connected with the production of natural gas during the relevant periods of time." [3]

This proposed amendment is rejected. I think there was sufficient evidence to support the inference that throughout the period of his employment Hugh Torrance was the foreman or supervisor of the other employees mentioned. It was stipulated that during the relevant period five of the defendant's employees to whom back wages are alleged to be due in this action included Hugh Torrance, who was employed from April 19, 1964 to April 17, 1966 (Pretrial Stipulation III, G, H, J; plaintiff's Ex. A). It was admitted by defendant's failure to answer plaintiff's Request for Admissions No. 40 that the number of hours worked by Torrance during the relevant period was an average of 49 hours per week (Trial Tr., pp. 32–33, 38–39).

> (5) " * * * [T]he aforementioned employees are exempt from the minimum wage and overtime provisions of the Act by Section 13 (a) (15) of the Act, as amended January 25, 1950." (29 U.S.C.A. § 213(a) (15).)[4]

The suggested addition is rejected.

At the argument on the motion the defendant orally moved to conform its Answer to the evidence pursuant to Rule 15(b), Fed.R.Civ.P. I think this oral motion also should be denied; it is a patent afterthought, untimely made.

In the whole proceeding there was not so much as a whisper that defendant's employees, or the defendant itself, were engaged in any forestry or lumbering operation: No such contention was made

---

2. Cf. the definition of "part" in Black's Law Dictionary.

3. Defendant requested that the language used in its brief, p. 5, be substituted for the language contained at (4) of its motion.

4. Section 213(a) (15), 29 U.S.C.A., provides:

 "(a) The provisions of sections 206 and 207 of this title shall not apply with respect to—

"(15) any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed twelve."

in defendant's pretrial statement, the pretrial stipulation, at the pretrial conference, at the trial, in defendant's request for findings, or in its brief.

There was evidence brought out on cross-examination that one employee cut trees and another dug pine trees from the nursery and loaded Scott's truck with cord wood, which trees and cord wood were sold by the defendant. Defendant's counsel stated that the significance of this cross-examination was to show the court that Schweinsburg's non-exempt duties were de minimus (Trial Tr., pp. 19–20).

Not until the motion to amend was filed, almost seven months after the trial, was there any suggestion that defendant contended that evidence had been adduced which formed a basis for exemption under § 13(a) (15).

 The defense of exemption, assuredly an affirmative one, was not raised in the Answer, Rule 8(c), Fed.R. Civ.P., nor at trial; hence it was waived, Rule 12(h), Fed.R.Civ.P. This defense was not tried by express or implied consent of the parties. Thus, I do not think it would be proper to allow the oral amendment after judgment. An amendment after judgment stating a new defense is not permissible under the guise of conforming the pleadings to the proof. Simms v. Andrews, 118 F.2d 803, 807 (10th Cir. 1941). An amendment is not authorized by Rule 15(b) merely because evidence material to the issues created by the pleadings incidentally tends to prove another fact not within those issues. Id. Cf. Anderson v. National Producing Co., 253 F.2d 834, 838 (2d Cir. 1958). To permit the proposed oral amendment would prejudice the plaintiff who had no idea at any time prior to, during, or after the trial that the defense of exemption under § 13(a) (15) was even contemplated. As stated in Systems Incorporated v. Bridge Electronics Company, 335 F.2d 465, 466 (3d Cir. 1964):

"An affirmative defense which is neither pleaded as required by rule 8(c) nor made the subject of an appropriate motion under rule 12(b) is waived. Rule 12(h), 28 U.S.C.A.; [citations omitted]. The waiver is final if the defendant fails to correct the omission either prior to trial or during trial, as permitted by rule 15(a) (b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Ibid. The defendant made no application to amend the pleadings or otherwise correct the omission.

"Rule 15(b), supra, provides in pertinent part as follows:

'When issues not raised by the pleadings are tried by *express or implied consent of the parties,* they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; *but failure so to amend does not affect the result of the trial of these issues.'* (Emphasis supplied.)

The rule is applicable only where it clearly appears from the record that an issue not raised in the pleadings and not preserved in the pretrial order has in fact been tried and that this procedure has been authorized by express or implied consent of the parties. [Citations omitted.]"

The issue of exemption under § 13(a) (15) was not tried or even mentioned at trial.

 However, even if we assume that the affirmative defense has been raised properly, the evidence brought out on cross-examination was insufficient to prove that defendant's employees were exempt under the operative specifications of section 13(a) (15) (see f. n. 4, supra). The defendant failed to sustain its burden in this respect. Cf. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

An appropriate order will be entered.